25CA0861 Peo in Interest of KE 12-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0861
Mesa County District Court No. 22JV5
Honorable Craig P. Henderson, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of K.E., G.E., and E.E., Children,

and Concerning K.S. and J.E.,

Appellants.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Pawar and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 24, 2025

---

Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Robert G. Tweedell, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant K.S.

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant J.E.

¶ 1    J.E. (father) and K.S. (mother) appeal the judgment terminating their parent-child legal relationships with K.E., G.E., and E.E. (the children).  We affirm.

## I.    Background

¶ 2    In January 2022, the Mesa County Department of Human Services received a report about a law enforcement investigation into an allegation that father had punched S.E. — the couple's fifteen-year-old daughter — and threatened to kill her.  During the investigation, law enforcement learned of other allegations of physical abuse by father, including incidents in which he reportedly shot S.E. with an "airsoft gun" and wrapped duct tape around her head.  Based on these reports, law enforcement arrested the parents, removed the children from the home, and placed them into the Department's custody.

¶ 3    The Department then filed a petition in dependency or neglect, alleging physical abuse by father, failure to prevent that abuse by mother, domestic violence between the parents, and concerns about the condition of the home.  The parents accepted a deferred adjudication under section 19-3-505(5), C.R.S. 2025, and they agreed to comply with treatment plans adopted by the court.  Before

the deferred period expired, the parents resolved their criminal cases: (1) a jury found father not guilty after a trial, and (2) the criminal court dismissed mother's case at the district attorney's request. After resolving their criminal cases, the parents believed that the children should be returned to them, but they nevertheless agreed to admit to the petition so that the court could enter a formal adjudication. However, the parents requested a return home hearing, which occurred over multiple days between May 2023 and January 2024. After the hearing, a magistrate entered a written order denying the parents' request.

¶ 4 In March 2024, the Department moved to terminate the parents' parental rights. Before the termination hearing occurred, S.E. turned eighteen, and the court dismissed her from the case. The juvenile court held a hearing on whether to terminate the parents' parental rights to the other three children over five days in January and March 2025, and it heard testimony from three caseworkers, a life skills worker, a foster parent, individuals involved with the criminal cases, father's therapist, a family time coordinator, father's expert witnesses, and both parents. After hearing the evidence, the court determined that, although the

2

criminal cases were resolved in the parent's favor, "there were numerous issues arising" from those incidents that the parents needed to address to become fit, as well as other issues not related to the criminal cases. But the court found that the parents had not addressed any of those issues because they did not comply with their treatment plans and were therefore unfit. The court terminated the parent-child legal relationships between the parents and the children.

## II. Termination Criteria and Standard of Review

¶ 5 A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6 Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's

3

factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## III.    Treatment Plan

¶ 7    Father asserts that his treatment plan was inappropriate because the components requiring him to complete a capacity to parent evaluation and neuropsychological evaluation were unnecessary. We discern no reversible error.

## A. Additional Background

¶ 8    Father's original treatment plan under the deferred adjudication agreement required him to (1) participate in family time; (2) address his mental health and/or substance abuse issues; (3) complete a psychological evaluation; (4) maintain stable housing and income; (5) engage in life skills training and parenting education; (6) cooperate with the caseworker and other

professionals; and (7) comply with the conditions of his criminal case.

¶ 9     In March 2023, the Department moved to amend father's treatment plan as follows: (1) substitute the psychological evaluation for a neuropsychological evaluation (component three) and (2) add a capacity to parent evaluation (component eight). Father objected to these modifications.  At the adjudication and dispositional hearings in April 2023, the magistrate noted the objection to the new components and stated that the parties would "probably have to set [a] hearing[] on the motion[] to modify the treatment plan."  The court then adopted the original treatment plan.

¶ 10    In August 2023, the Department filed a motion for permanent plan review, in which it requested that the magistrate amend the treatment plan to remove the objective related to father's criminal case.  However, the form order submitted alongside the motion included an amended treatment plan that not only removed the criminal case objective but also included amended component three and component eight.  Although the magistrate did not address the amended treatment plan at the permanency planning hearing, it

5

signed the form order and therefore effectively adopted the amended treatment plan.

¶ 11    In December 2023, the Department filed another motion for permanent plan review; that motion did not request any amendments to the treatment plan, and the form order submitted alongside the motion still included the new components.  On the final day of the return home hearing in January 2024, father's counsel asked the magistrate to allow her to present testimony from her expert witness on the appropriateness of components three and eight.  In response, the magistrate stated that counsel never filed a written response to the motion filed in December (even though that motion did not request amendments to the treatment plan).  The magistrate did not permit father's counsel to question the witness about the amended treatment plan, but the magistrate gave counsel seven days to respond to the December motion.

¶ 12    Father's counsel responded, arguing that the amended treatment plan was inappropriate.  But at the next permanency review hearing, the magistrate told counsel that she could not object to the components at that point because he had already ordered them in August 2023.  Counsel then said that she would

6

"change [her] pleading to a motion to amend to delete th[ose] portion[s]" of the treatment plan, and she requested an evidentiary hearing on removing components three and eight from the plan. The court held a hearing over four days in July 2024. After hearing the evidence, the magistrate denied father's request to amend the treatment plan, finding that the amended treatment plan was "reasonable and appropriate."

¶ 13    At the termination hearing, the juvenile court found that father's treatment plan was appropriate, and it noted that components three and eight were "clearly necessary for reunification."

## B. Analysis

¶ 14    On appeal, father first asserts that he was deprived of due process when the magistrate denied him an opportunity to be heard on the amended components. But as father acknowledges, he never challenged any of the magistrate's rulings. A petition for review of the magistrate's order is a prerequisite before an appeal may be filed with this court. *See* § 19-1-108(5.5), C.R.S. 2025. Therefore, we lack jurisdiction to consider father's challenges to the magistrate's rulings. *See In re Parental Responsibilities Concerning*

*J.H.*, 2021 COA 94, ¶ 14 (dismissing an appeal of a parentage adjudication because the appealing party did not file a petition for review with the district court).

¶ 15    Father also asserts that his attorney was ineffective for failing to challenge the magistrate's rulings. In evaluating a claim of ineffective assistance of counsel in a dependency or neglect proceeding, the parent must show that (1) counsel's performance was outside the wide range of professionally competent assistance and (2) counsel's deficient performance prejudiced the parent — that is, a reasonable probability exists that but for counsel's unprofessional errors, the proceeding's outcome would have been different. *A.R. v. D.R.*, 2020 CO 10, ¶ 60. "If the parent fails to establish either prong of this test, the claim fails." *People in Interest of C.B.*, 2019 COA 168, ¶ 26.

¶ 16    Even assuming, without deciding, that counsel provided deficient performance, father's allegations are not sufficient to prove prejudice. *See A.R.*, ¶ 63 (when a parent's allegations lack sufficient specificity, the appellate court may summarily deny the ineffective assistance claim). In his brief, father alleges that he was prejudiced because, but for counsel's deficient performance, "there

would have been clarity as to what was included in the court-ordered treatment plan and there would have been appellate review."  But father has not explained how the outcome of the proceeding would have been different if counsel had filed a petition for magistrate review.  What's more, father does not allege that, had counsel filed a petition for magistrate review, he would have succeeded, the components would have been removed, and his parental rights would not have been terminated.  We therefore reject father's ineffective assistance of counsel claim.

¶ 17    Finally, father asserts that the juvenile court erred by finding that the amended treatment plan was appropriate.  We disagree.

¶ 18    The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required the government's intervention.  *K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006).  A treatment plan is appropriate if it is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time and relates to the child's needs.  § 19-1-103(12), C.R.S. 2025.

¶ 19    As for component three, father asserts that he did not need a neuropsychological evaluation because the purpose of the

9

evaluation was to discover if he had any disabilities, but he had already told the Department that he had disabilities and needed accommodations. Although the record indicates that father told the Department about his disabilities and made some requests for accommodations, the evidence also shows that a neuropsychological evaluation was necessary to help accommodate father. For example, father said that he had a brain injury and "borderline autism," but he did not offer the Department any information about a formal diagnosis or specific accommodations. The second caseworker testified that the neuropsychological evaluation (which father's attorney originally requested) could have provided clear diagnoses and made recommendations on the services that the Department could have offered father. Therefore, the record supports the juvenile court's finding that component three was appropriate.

¶ 20     As for component eight, father asserts that he did not need a capacity to parent evaluation because "there was no identified problem during the parents' parenting time that would necessitate a parent capacity evaluation." In support of this argument, father relies on the opinion of his own expert witness. But the juvenile

10

court did not rely on this expert's opinion when it made its decision. In other words, the court did not find father's expert persuasive, and we must defer to that decision when the evidence supports the court's judgment. *See A.J.L.*, 243 P.3d at 249-50. In this case, two caseworkers, who were designated as experts in child protection, testified that the treatment plan was appropriate with components three and eight. Therefore, because the record supports the court's finding, we cannot disturb its decision.

## IV.    Reasonable Efforts

¶ 21    Both parents contend that the juvenile court erred by finding that the Department made reasonable efforts. We disagree.

### A. Applicable Law

¶ 22    In determining fitness under section 19-3-604(1)(c), the juvenile court must consider whether the county department of human services made reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" is defined as the "exercise of diligence and care" to reunify parents with their children, and the department's reasonable efforts obligation is satisfied if it provides services in accordance with section 19-3-208. § 19-1-103(114).

¶ 23     When determined "necessary and appropriate," the department must provide (1) screening, assessments, and individual case plans; (2) home-based family and crisis counseling; (3) information and referral services; (4) family time; and (5) placement services. § 19-3-208(2)(b). The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 24     The parent is ultimately responsible for using the services to comply with the plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). And the juvenile court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

## B. Analysis

¶ 25    The juvenile court determined that the Department made reasonable efforts to rehabilitate the parents and reunite them with the children, but the parents did not use the resources the Department provided to become fit.  The court found that the caseworkers "authorized services, attempted to facilitate the completion of every aspect of the treatment plans, [provided] financial assistance, and . . . tried to ascertain appropriate accommodations for the parent's needs."  The court noted that, in response to these efforts, the caseworkers "were met with resistance, stonewalling, and hostility."

¶ 26    The record supports the juvenile court's findings.  As noted above, father's treatment plan included components addressing family time, mental health and/or substance abuse, a psychological or neuropsychological evaluation, housing and employment, life skills and parenting education, and a capacity to parent evaluation. Mother had a similar treatment plan, except that she was required to complete a danger/risk assessment instead of a psychological/neuropsychological evaluation.

¶ 27    Neither parent contends that the Department generally failed to offer the services necessary to complete the objectives in the treatment plan.  Indeed, the record shows that the Department provided supervised family time services, co-occurring assessments for the parents' mental health and substance abuse issues, a danger/risk assessment for mother, a psychological and a neuropsychological evaluation for father, life skills training, parenting classes, and capacity to parent evaluations.

¶ 28    But the record shows that, other than family time, the parents minimally engaged in the services.  To be sure, the parents completed co-occurring assessments, and mother completed the danger/risk assessment, but neither parent followed the recommendations from those assessments.  Father never complied with the psychological or neuropsychological evaluation and neither parent participated in the capacity to parent evaluation.  The parents met with a life skills worker for a short time, but essentially "fired" the worker and never engaged with another one.  The Department also made referrals for parenting classes, but the parents did not sign releases, so those classes were never set up.

¶ 29     Nevertheless, the parents assert, for the five reasons below, that the Department failed to make reasonable efforts. We address and reject all five arguments.

¶ 30     First, father contends that the Department failed to make appropriate and timely referrals to services. We discern no reversible error.

- Father asserts that the Department did not provide a parenting class because the identified class was canceled for lack of participants. Not so. Although the caseworker said that one class was canceled because of a lack of participants, she could have referred father to the next class if he had signed the release of information. And even if the class lacked participants, the caseworker testified that the provider was willing to work with father on an individual basis.

- Father argues that he requested a life skills worker who had experience working with parents with disabilities, but the Department never referred him to one. Father had a life skills worker that he refused to work with after a few months. The Department attempted to refer father

15

to another life skills worker, but he decline to participate. And father told the caseworkers that he did not need life skills. Under these circumstances, we cannot say that the Department failed to provide the requested worker.

- We are not persuaded by father's contention that the Department failed to make timely referrals to the neuropsychological evaluation and capacity to parent evaluations. Although the record shows that the second caseworker did not make referrals when the magistrate amended the treatment plan in August 2023, she made referrals in early 2024. Father therefore had close to a year to complete these evaluations but did not do so.

- Nor are we convinced by father's assertion that the Department should have referred him to a different provider to complete the evaluations because the Department's provider had a conflict of interest. Contrary to father's argument, he did not ask for a different provider because of a conflict of interest; rather, he told the caseworker that the Department's provider had refused him services, which was not accurate.

¶ 31    Second, father argues that the Department withheld gas cards from him as a punishment. If a department has additional funds, section 19-3-208(2)(d) requires it to provide transportation to services when other appropriate transportation is not available. The record shows that the Department provided father with gas cards in the amount of forty dollars for most of the case. However, the second caseworker testified that the Department reduced the amount to twenty dollars for two or three months because father was not attending services, except for parenting time. The caseworker said that, after talking to her supervisors, she managed to reinstate the full amount. Father does not direct us to anything in the record indicating that he missed any services or appointments because of the short-term reduction in gas cards. We therefore discern no reversible error.

¶ 32    Third, the parents assert that the Department failed to make reasonable efforts because it never expanded or liberalized their family time. Section 19-3-208(2)(b) only requires that the Department provide family time services "as determined necessary and appropriate by individual case plans." Stated another way, to satisfy the reasonable efforts requirement, the Department must

provide family time as ordered by the court. It is undisputed that the Department provided the court-ordered family time. The record therefore shows that the Department satisfied its burden under section 19-3-208, and we are not convinced that it had any duty to exercise its discretion to expand or liberalize family time, especially considering that the parents were not addressing the concerns in the case.

¶ 33　　Fourth, the parents assert that the Department failed to make reasonable efforts because it did not make reasonable accommodations for them as required by the Americans with Disabilities Act (ADA). We are not persuaded.

¶ 34　　Services provided under section 19-3-208 must comply with the ADA. *See* § 19-3-208(2)(g). The ADA mandates that public entities — such as a county department of human services — make reasonable modifications to existing policies and services to reasonably accommodate qualified individuals with disabilities. 42 U.S.C. § 12101(a)(5). A parent may be a qualified individual with a disability if the parent has a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

18

¶ 35    A parent is responsible for disclosing information about a disability and any accommodations that are needed to address the disability. *See People in Interest of S.K.*, 2019 COA 36, ¶ 21. Whether a parent is a qualified individual with a disability under the ADA requires a fact-specific determination that, if disputed, the juvenile court should resolve. *See id.* at ¶ 21 n.2. And if the court determines that a parent is a qualified individual with a disability, it must consider if reasonable accommodations were made for the parent's disability when determining whether the department made reasonable efforts. *Id.* at ¶ 34.

¶ 36    The record shows that father never provided the Department with any information about his disabilities, except for a letter indicating that he received Social Security Disability Insurance (SSDI). Father said that he had a shoulder injury, a brain injury, and autism spectrum disorder. But the record is unclear if he was receiving SSDI for one or all of these disabilities. Because father did not provide a formal diagnosis for his disabilities, the Department asked him to complete a neuropsychological evaluation. As discussed, father never completed the evaluation.

¶ 37     In any event, assuming that father was a person with a qualifying disability, he testified that he never asked for accommodations. Nevertheless, he now argues that the Department did not make reasonable accommodations because it did not (1) provide him with a life skills worker experienced in working with disabled parents or (2) refer him to an online parenting class. We reject these arguments for the same reasons described above.

¶ 38     Father also asserts that his attorney provided ineffective assistance of counsel by failing to file a petition for magistrate review after the magistrate denied his motion for accommodations. But he does not develop this argument, and we therefore conclude that his allegations are insufficient. *See A.R.*, ¶ 63.

¶ 39     As for mother, the record shows that she had epilepsy, cerebral palsy, and scoliosis. Like father, mother provided the Department with her SSDI paperwork, but the Department could not ascertain the nature of mother's disabilities or what accommodations she needed. And mother does not direct us to anything in the record indicating that she ever formally requested ADA accommodations from the Department during the case. At the

termination hearing, she testified that her disabilities never "prevented [her] from being a parent or doing things that needed to be done for this case."

¶ 40 That said, the record shows that mother sometimes had problems with physical labor because of her disabilities, and she told the first caseworker that she wanted a more "hands-on" life skills worker to help her with the condition of the home. The second caseworker said that she contacted a provider to see if it had someone who could engage in "physical labor," but they did not provide that service or know of anyone in the area who did. In any event, even if the Department could have done more to provide a "hands-on" life skills worker, we discern no reversible error because (1) the record shows that the parents improved the condition of the home without additional assistance and (2) the juvenile court did not base its termination judgment on the condition of the home.

¶ 41 Finally, mother contends that the Department did not provide her with an appropriate danger/risk assessment. The Department's original proposed treatment plan for mother required her to complete a domestic violence evaluation. Mother objected to this component, and the parties compromised by changing the

21

component to require a danger/risk assessment. The Department referred mother to the assessment, but she took issue with the assessment's focus on domestic violence. The second caseworker testified that the danger/risk assessment had to consider domestic violence if that was one of the risk factors for the parent. Therefore, we are not convinced by mother's assertion that the Department failed to provide her with the necessary assessment to become a fit parent.

¶ 42 In sum, we conclude that the record supports the juvenile court's findings that the Department provided the necessary resources for the parents to comply with their treatment plans, but they did not use those resources to become fit parents. *See A.V.,* ¶ 12; *J.C.R.,* 259 P.3d at 1285. We therefore decline to disturb the court's judgment.

## V. Fitness

¶ 43 The parents next argue that the juvenile court erred by finding that they were unfit. We are not persuaded.

¶ 44 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.,* 160 P.3d 351, 353 (Colo. App. 2007).

Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 45 The juvenile court found that the parents were unfit. The court noted that "neither parent meaningfully engaged in their respective treatment plans, and, in fact, actively resisted them." It further found that the parents' "pattern of resistance, mistrust, and hostility . . . ultimately culminated in the overall failure of the parents in complying with the treatment plans." As a result, the court determined that "neither parent had made sufficient progress towards becoming fit parents."

¶ 46 The record supports the court's findings. As described in Part IV.B., above, the parents participated in family time and some of the evaluations but did not otherwise participate in any services necessary to rehabilitate them. The second and third caseworkers

23

said that the parents resisted working on their treatment plans, noting that they would say that they did not need the services or that they simply would not do them. The caseworkers also opined that the parents were unfit because they did not understand the children's needs, address the concerns about abuse and violence in the home, comply with their treatment plans, show that they could be protective parents, and make any behavioral changes.

¶ 47 Father asserts that the juvenile court erred by finding him unfit because he "complied with the majority of his treatment plan and was appropriate in parenting time," while mother contends that she was fit because she "maintained a loving relationship with the children and ensured that the family home was a safe and stable environment in which they could return." Although the record supports aspects of the parents' assertions, the court considered that evidence, weighed it against the evidence to the contrary (as described above), and concluded that the parents were unfit. We must reject the parents' assertions because it would require us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.

## VI.     Children's Best Interests

¶ 48     Finally, the parents maintain that the juvenile court erred by terminating their parental rights because termination was not in the children's best interests.  We disagree.

¶ 49     In addition to the statutory criteria in section 19-3-604(1)(c), the court must also consider and eliminate less drastic alternatives to termination.  *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  "These criteria require the [juvenile] court to give primary consideration to the child's physical, mental, and emotional needs."  *A.M.*, ¶ 20.  Therefore, the "primary and controlling issue in termination proceedings, even though parental rights are at stake, is the determination of what will best serve the interests and welfare of the child."  *Id.* (quoting *K.D.*, 139 P.3d at 701).

¶ 50     In this case, the juvenile court determined that the parents had not complied with their treatment plans, were unfit, and were unlikely to change in a reasonable time.  The court also found that there were no less drastic alternatives to termination and that termination was in the children's best interests.  In doing so, the court noted that the children needed "stability, permanency, and a safe environment," which they could receive in an adoptive home

but not from the parents. The court concluded that it could not return the children home because doing so "would be detrimental to the children's needs and unnecessarily damage what progress ha[d] been made."

¶ 51 The record supports the court's findings. The second caseworker testified that termination was in the children's best interests because (1) the parents had not engaged in their treatment plans to address the safety concerns and (2) the children needed permanency after "three years in limbo." She also said that there were no less drastic alternatives available because there were no kin options willing to take the children; nor would more time serve the children's best interests because the parents refused to work on their treatment plans. The third caseworker agreed that termination was in the children's best interests, noting that they needed a safe and stable environment and deserved to have a permanent home that could meet all their needs. She further noted that the children were in an adoptive home and the placements were currently meeting all those needs. Finally, the third caseworker confirmed that the Department had not located any

relatives willing to take placement or participate in an allocation of parental responsibilities.

¶ 52　Despite this evidence, the parents assert that other evidence in the record refutes the juvenile court's finding that termination was in the children's best interests. For example, they note that the evidence showed that one child was injured in foster care, another child experienced inappropriate touching by a fellow foster child, the children expressed a desire to return home to their parents, and the children would be separated if not returned home because they were in different placements. The parents also assert that, because they attended family time regularly throughout the case, they continued to have a strong bond with the children.

¶ 53　We recognize that these are some of the factors a court may consider when determining whether termination is in a child's best interests. *See People in Interest of H.L.B.*, 2025 COA 86, ¶ 27. But as described above, the evidence supported the court's finding that returning the children home would not be in their best interests. And the parents do not argue for a less drastic alternative other than returning the children home. Because the record supports the court's findings, we cannot reweigh the evidence or substitute our

judgment to reach a different conclusion. *See id.* at ¶ 34 (acknowledging that the record "could support a contrary outcome" but noting that an appellate court "must defer to the juvenile court's weighing of the conflicting evidence"). We therefore reject the parents' assertions.

## VII.    Disposition

¶ 54    The judgment is affirmed.

JUDGE PAWAR and JUDGE YUN concur.